# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **DIRK ORME,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:13CV950 ACL** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision denying the application of Dirk Orme for Supplemental Security Income Benefits under Title XVI of the Social Security Act.   This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.   See 28 U.S.C. § 636(c).   Plaintiff filed a Brief in support of the Complaint.   [Doc. 13] Defendant filed a Brief in Support of the Answer.   [Doc. 18]

## Procedural History

On May 19, 2010, Plaintiff filed an application for Supplemental Security Benefits, claiming that he became unable to work due to his disabling condition on February 1, 2003.   (Tr. 113-16.)   This claim was denied initially and, following an administrative hearing, Plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated June 11, 2012.   (Tr. 67-71, 6-19.)   Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 18, 2013.   (Tr. 5, 1-4.)   Thus, the decision of the ALJ stands as the final decision of the

Commissioner.   See 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

A.   **ALJ Hearing**

Plaintiff's administrative hearing was held on April 24, 2012.   (Tr. 22.)   Plaintiff was present and represented by counsel.   Id.   Also present was Vocational Expert Dolores Gonzalez. Id.

The ALJ examined Plaintiff, who testified that he was forty-two years of age, divorced, and had a thirteen-year-old son.   (Tr. 25.)   He lives at his parents' home on the ground floor of the two-story home, and his parents live in the basement.   (Tr. 26.)   Two teenaged children, who are friends of the family, live on the second floor of the home.   Id.   Plaintiff's parents take care of the teenagers, because their parents are disabled.   Id.

Plaintiff testified that he attended college for a year-and-a-half, and did not obtain a degree. (Tr. 28.)   In regard to criminal history, he was sentenced to ten days of "work release" for a DUI (pain medication)conviction.   (Tr. 29, 42.)

Plaintiff testified that he was not working at the time of the hearing.   (Tr. 29)   He had been receiving food stamps and Medicaid benefits for approximately eight years.   (Tr. 29-30.) Plaintiff thought that he may have filed a workers' compensation claim for a right shoulder injury he sustained.   (Tr. 30.)

Plaintiff's last work was in 2004 when he worked as a carpet cleaner.   (Tr. 31.)   He worked at the position for only about one week, because he sustained an injury after falling.   Id. Plaintiff stated that he did not file a claim related to this injury.   (Tr. 32.)

Plaintiff's work prior to 2004 included: working for a tile company for a short period,

where he worked as a "helper," assisting with tile repair and tearing out floors, id.; selling carpet (Tr. 33) and driving a forklift as an independent contractor from 1999 through 2001 (Tr. 37); working as a "helper" at a printing press in 1998, where he was involved stacking the printed material when it came off the printing machine (Tr. 33-34); working as a "picker" at AT Tools in 1997 where he took items off the shelves and put them on to a cart to be shipped, (Tr. 34); working at Tetra Plastics, which involved taking a plastic part off the press, stacking it, and checking it (Tr. 35); working at a gold mine in Alaska in 1996 where he drove a bulldozer and excavator (Tr. 36); and installing electronic locks at motels in 1996 at National Lock. Id.

The ALJ noted that Plaintiff had walked into the hearing room using a cane. (Tr. 38.) Plaintiff testified that he always uses the cane when walking, unless he is walking a very short distance. (Tr. 39.) Plaintiff's doctor prescribed the cane. Id.

Plaintiff underwent hip replacement surgery in 2003 and 2006. Id. He had surgery on his right knee in 2010. (Tr. 40.) Although Plaintiff experiences back pain, he has not had back surgery. Id. Plaintiff had surgery on his left foot for a broken heel and he no longer has foot pain. (Tr. 41.)

Plaintiff stated that he is permitted to see his son every other weekend, but he has not been seeing him. Id. Plaintiff's parents have been making his child support payments, which are $200.00 a month. (Tr. 40-41.)

Plaintiff testified that he was not taking any pain medications at the time of the hearing. Id. Plaintiff stated that he does have a history of drinking alcohol or using any illegal drugs. (Tr. 42.)

Plaintiff does not have a driver's license. Id. He lost his license in 2009, as a result of the

DWI and he has not tried to get his license back, because he cannot afford a car.   (Tr. 43.)

Plaintiff testified that he does not do any housework or yard work.   Id.   Plaintiff's mother shops for groceries for him.   Id.   Plaintiff testified that he watches television and reads all day. (Tr. 44.)

Plaintiff stated that he is able to walk with his cane about 100 feet before he has to rest and that he is able to stand without his cane for "a couple minutes."   Id.   He can sit for about twenty minutes before he has to stand up and stretch.   Id.   Plaintiff testified that he does not lift "anything," because he does not have the balance to lift.   (Tr. 45.)

The ALJ pointed out that in July of 2009, Dr. Sandra Tate examined Plaintiff and found Plaintiff could lift up to thirty pounds.   Id.   Plaintiff replied that he underwent knee surgery after Dr. Tate's examination and indicated that he cannot lift thirty pounds without falling over due to his balance issues.   (Tr. 46.)

The ALJ next noted that Plaintiff underwent a consultative examination with Dr. Charles Mannis in December of 2010.   Id.   Plaintiff testified that he could lift ten to fifteen pounds, but he was "not sure" if Dr. Mannis' findings were accurate.   Id.   When asked if he could perform a job where he was seated eight hours a day, Plaintiff responded:   "I mean, I would—if they let me get up and—if they let me stand up, you know, and sit down.   You know, if they really worked with me."   (Tr. 47.)

When questioned by his attorney, Plaintiff testified that he can only walk up stairs one at a time if he is holding on to something.   Id.   Plaintiff stated that he is able to bathe and dress himself, and uses a "shoe horn thing" that allows him to put on his shoes without bending down. (Tr. 48.)

Plaintiff stated that he has fallen five to six times in the past two years due to his balance problem.  Id.  He does not walk up stairs and stays on the main floor of his home.  (Tr. 49.)  He moved to the main floor of the home in 2003.  Id.

The ALJ examined Vocational Expert (VE) Dolores Gonzales, who testified that Plaintiff's past work is classified as follows: binder machine feeder offbearer (light, unskilled); card key lock installer (light, semi-skilled); carpet sales person (light, semi-skilled); and production assembler (light, unskilled).  (Tr. 52-53.)

The ALJ asked the VE to assume a hypothetical claimant with Plaintiff's background and the following limitations: light work; must have a sit/stand option with the ability to change positions frequently; can climb stairs and ramps occasionally; can never climb ropes, ladders, or scaffolds; can never kneel, crouch, or crawl; limited to frequent pushing and pulling with legs; ambulates with a cane; and must avoid concentrated exposure to extreme cold, wetness, hazards of heights, and machinery.  (Tr. 53.)  The VE testified that the individual would be unable to perform Plaintiff's past work but could perform other light, unskilled jobs such as order caller (41,844 positions nationally, 983 in Missouri); and mail sorter (25,532 positions nationally, 607 in Missouri).  Id.

The ALJ next asked the VE to assume a hypothetical individual who was limited to sedentary work, with no sit/stand option but the other limitations from the first hypothetical remained.  (Tr. 54.)  The VE testified that the individual could perform the following sedentary positions: information clerk (997,080 positions nationally, 15,220 in Missouri); and callout operator (57,220 positions nationally, 610 in Missouri).  Id.

The ALJ asked the VE to assume the same limitations as the second hypothetical, except a

sit/stand option would be included.   Id.   The VE testified that the individual could still perform

the information clerk position.   Id.   The VE stated that the individual could also perform work as

a food and beverage order clerk (211,370 positions nationally, 4,440 in Missouri).   (Tr. 55.)

The ALJ next asked the VE to assume the same limitations as the third hypothetical, but the

claimant would require two additional breaks.   Id.   The VE testified that the individual would not

be able to perform any jobs with this limitation.   Id.

In response to a question by Plaintiff's attorney the VE stated that an individual who was

unable to sustain forty hours of work per week would not be capable of any competitive work.   Id.

The VE testified that she relied on her professional experience in answering the ALJ's

questions about the limitation of a sit/stand option with the need to change frequently.   (Tr. 56.)

The VE stated that she had placed approximately ten individuals in the positions of order caller,

mail sorter, information clerk, or food and beverage order clerk since May of 2010.   Id.

## B.      Relevant Medical Records

Plaintiff presented to Mark K. Keohane, M.D., at St. Charles Orthopaedic Surgery

Associates, Inc., on January 24, 2003, with complaints of hip pain.   (Tr. 202.)   Dr. Keohane

stated that Plaintiff "has for some unknown reason very osteoarthritic changes in both hips."   Id.

Plaintiff's clinical examination and x-rays revealed advanced osteoarthritic changes with minimal

hip motion.   Id.   Plaintiff reported that he was unable to put his shoes and socks on, was having

trouble walking, and was unable to perform his manual labor job.   Id.   Dr. Keohane indicated that

Plaintiff would benefit from hip arthroplasty.[1]   Id.

Plaintiff saw Anthony Berni, M.D., on February 3, 2003, upon the referral of Dr. Keohane,

---

[1]  Creation of an artificial joint to correct advanced degenerative arthritis.   Stedman's Medical
Dictionary, 161 (28th Ed. 2006).

to discuss the possibility of total hip arthroplasty. (Tr. 197.) Plaintiff was unable to ambulate. Id. Dr. Berni stated that a total hip arthroplasty was a reasonable option. Id. Plaintiff underwent right total hip arthroplasty on March 2, 2003. (Tr. 196.) A month later, Plaintiff's surgical incision site was healing "quite nicely," and his hip range of motion was well-tolerated and nonpainful. Id.

Plaintiff went to see Dr. Berni on April 23, 2003, at which time he reported he had fallen and had pain in his right hip. (Tr. 195.) Plaintiff underwent x-rays, which revealed no change in location of the prosthesis or any obvious abnormalities. Id. Dr. Berni stated that Plaintiff was improving overall, and advised him to continue to advance his weightbearing as tolerated. Id.

On July 2, 2003, Plaintiff was doing "quite well," except that his knee was bothering him and he reported some muscular pain around his hip. Id. He had full range of motion of the knee on examination. Id. On September 3, 2003, Plaintiff was doing quite well, and had not taken pain medication since April. (Tr. 194.) Plaintiff reported worsening pain on his left side. Id. Dr. Berni indicated that Plaintiff would require a hip replacement on the left side. Id.

Several years later, between December 11, 2007 and August 2009, Plaintiff regularly visited Carter P. Fenton, D.O. (Tr. 209-219) On August 26, 2008, Plaintiff complained of back and right hip pain after falling. (Tr. 212.) Plaintiff was prescribed Percocet.[2] Id. Dr. Fenton's records note that Plaintiff underwent surgery on his left foot around March 4, 2009. (Tr. 213.) On April 14, 2009, Plaintiff complained of right hip pain, left knee pain, anxiety, and depression. Id. Dr. Fenton prescribed Lortab,[3] Celexa,[4] Neurontin,[5] and Flexeril.[6] Id. Plaintiff

---

[2] Percocet is indicated for the relief of moderate to moderately severe pain. Physician's Desk Reference (PDR), 1127 (63rd Ed. 2009).
[3] Lortab is indicated for the relief of moderate to moderately severe pain. PDR at 3143.
[4] Celexa is an antidepressant drug indicated for the treatment of depression. PDR at 1161.

complained of right hip pain in May 2009.   (Tr. 211.)

Plaintiff presented to Sandra Tate, M.D., on July 29, 2009, for an independent medical examination.   (Tr. 207-08.)   Dr. Tate indicated that she had reviewed Plaintiff's medical records, including records of a left total hip replacement Plaintiff had undergone in March of 2006.[7]   (Tr. 207.)   Plaintiff reported that the left hip was doing very well.   Id.   Plaintiff reported that he had been using a cane for long distance walking for the past six years, although he could walk short distances without it.   Id.   Plaintiff complained of chronic neck and low back pain, and an inability to bend or squat.   Id.   Upon examination, Plaintiff's mood and affect were appropriate; he was five-feet ten-inches tall and weighed 200 pounds; he had intact range of motion of the cervical spine; normal range of motion and strength in the upper extremities; no paravertebral tenderness or muscle spasm of the lumbosacral spine; range of motion of the lumbosacral spine was fifty degrees of flexion and ten degrees of right lateral rotation and fifteen degrees of left lateral rotation; straight leg raising test was negative; significant hamstring tightness was noted; range of motion of the hip was decreased to ninety degrees of flexion and internal and external rotation were thirty percent of normal; decreased range of motion of the knees and ankles bilaterally; full muscle strength; intact sensation of the upper and lower extremities; and abnormal gait, with decreased pushoff bilaterally but no limping.   (Tr. 208.)   Dr. Tate stated that Plaintiff had continued decreased range of motion of the hips and knees and complaints of chronic back pain.   Id.   Dr. Tate expressed the opinion that Plaintiff can work with restrictions of no prolonged standing or walking, no lifting more than thirty pounds in a squatting position, and no climbing

[5]  Neurontin is indicated for the treatment of nerve pain.   See WebMD, http://www.webmd.com/drugs (last visited September 26, 2014).
[6]  Flexeril is indicated for the treatment of muscle spasms.   See WebMD, http://www.webmd.com/drugs (last visited September 26, 2014).
[7]  Records from the left total hip replacement are not included in the administrative record.

stairs or ladders.   Id.   Dr. Tate stated that Plaintiff is "otherwise unlimited."   Id.

Plaintiff saw Dr. Fenton on August 3, 2009, at which time he complained of right hip, right knee, and left foot pain.   (Tr. 210.)

Plaintiff underwent an MRI of the right knee on June 17, 2010, which revealed an unstable right medial femoral condylar osteochondral lesion;[8] and mild chondrosis within the medial and patellofemoral compartments of the right knee.   (Tr. 226.)

Plaintiff saw Dr. Fenton on July 28, 2010, at which time he complained of increased pain in the right knee, and back pain.   (Tr. 242.)

On August 13, 2010, Plaintiff underwent right knee surgery at Washington University Orthopedics to repair the osteochondral lesion.   (Tr. 231.)

Plaintiff presented to Dr. Fenton on September 7, 2010, at which time he complained of right knee and right elbow pain after falling down stairs.   (Tr. 242.)   Dr. Fenton prescribed Norco.[9]   Id.   Plaintiff continued to complain of right knee and right hip pain on September 28, 2010, October 19, 2010, and November 9, 2010.   (Tr. 241.)

Plaintiff underwent x-rays of the bilateral knees on November 22, 2010, which revealed mild medial compartment osteoarthritis of the left knee and healed right medial femoral condyle osteochondral defect.   (Tr. 235.)

Plaintiff saw Dr. Fenton on November 30, 2010, at which time Dr. Fenton prescribed Norco for his knee and hip pain.   (Tr. 240.)

Plaintiff saw Charles Mannis, M.D., for an orthopedic evaluation at the request of the state

[8] A focal area of articular damage with cartilage damage and injury of the adjacent subchondral bone.   See Stedman's at 1389.

[9] Norco contains a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen).   It is indicated for the relief of moderate to severe pain.   See WebMD, http://www.webmd.com/drugs (last visited September 26, 2014).

agency on December 27, 2010. (Tr. 243-45.) Plaintiff complained of problems with his hips and knees, and low back pain. (Tr. 243.) Plaintiff indicated that he has had persistent problems with the right hip since surgery, but the left hip has done very well. Id. Plaintiff complained of pain in his right hip with activity and occasional giving out of his right leg when walking and going up stairs. Id. Plaintiff indicated that his right knee still occasionally "catches" following surgery. (Tr. 244.) Upon examination, Plaintiff ambulated with a mild limp favoring the right leg. Id. Examination of the low back revealed diffuse tenderness, and some restriction of low back motion from 0-60 degrees flexion, and 15 degrees left and right side bending. Id. Dr. Mannis noted some diffuse tenderness of the right hip, with some limitation of motion in both hips. Id. Examination of the right knee revealed slight soft tissue thickening of the right knee, tenderness, crepitus[10] with movement, and 0-135 range of motion as compared with 0-150 degrees on the left. Id. Plaintiff's sensory exam was grossly intact to pinprick, and straight leg raising test was negative in both sitting and supine positions. (Tr. 244-45.) Dr. Mannis diagnosed Plaintiff with status post bilateral total hip replacement; status post internal fixation for osteochondritis of the medial femoral condyle, right knee; and lumbar syndrome. (Tr. 245.) Dr. Mannis stated that Plaintiff is able to work "primarily in a sedentary capacity." Id. He stated that he did not believe Plaintiff was able to function in a capacity which involves bending, squatting, lifting, repetitive climbing, or prolonged standing or walking. Id.

Dr. Mannis also completed a questionnaire, in which he expressed the opinion that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand or walk at least two hours total; and sit with normal breaks about six hours total. (Tr. 246.) When asked if Plaintiff could

_____

[10] Noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions. Stedman's at 457.

sustain a forty-hour workweek on a continuous basis, Dr. Mannis checked "no," however, commented "in sedentary capacity." Id.

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since May 19, 2010, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: congenital hip dysplasia, status-post bilateral total hip replacements; lumbar syndrome; and osteoarthritis of the knee. (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant can lift no more than ten pounds frequently and up to twenty pounds occasionally; stand and walk up to two hours total in an eight hour workday; and sit up to six hours in an eight hour workday. The claimant can occasionally stoop and climb ramps and stairs. The claimant can never kneel, crouch, crawl, or climb ropes, ladders, and scaffolds. The claimant can occasionally push or pull with the lower extremities. The claimant must avoid concentrated exposure to extreme cold and wetness; working at unprotected heights; and working with or around hazardous machinery. The claimant would also need a cane to ambulate.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965). This finding is based on the credible testimony of the vocational expert.

6.  The claimant was born on August 10, 1969 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since May 19, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 11-16.)

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on May 19, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 16.)

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.   See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).   The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.   See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).   Substantial evidence is less than a preponderance of evidence, but enough that a reasonable mind might accept it as adequate to support a conclusion.   See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).   If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.   See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.   See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).   "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in

Appendix One to 20 C.F.R. 404.   20 C.F.R. pt. 404, subpt. P, App. 1.   If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.   See 20 C.F.R. § 404.1520 (e), 416.920 (e).   If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.   See id.   If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).   The claimant is entitled to disability benefits only if s/he is not able to perform any other work.   See id.   Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.   See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

C.     **Plaintiff's Claims**

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC.   Plaintiff also contends that the hypothetical question posed to the vocational expert was erroneous.   The undersigned will discuss Plaintiff's claims in turn.

1.     **Residual Functional Capacity**

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant can lift no more than ten pounds frequently and up to twenty pounds occasionally; stand and

walk up to two hours total in an eight hour workday; and sit up to six hours in an eight hour workday. The claimant can occasionally stoop and climb ramps and stairs. The claimant can never kneel, crouch, crawl, or climb ropes, ladders, and scaffolds. The claimant can occasionally push or pull with the lower extremities. The claimant must avoid concentrated exposure to extreme cold and wetness; working at unprotected heights; and working with or around hazardous machinery. The claimant would also need a cane to ambulate.

(Tr. 11.)

Plaintiff argues that the ALJ failed to point to "some" medical evidence to support his RFC findings, and therefore fails to comply with the standards contained in Singh and Lauer.

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff contends that the ALJ's determination regarding Plaintiff's limitations is not supported by substantial evidence, because the ALJ failed to cite any medical evidence for his findings. Contrary to Plaintiff's contention, however, the ALJ cited specific medical evidence upon which he relied.

The ALJ first stated that none of Plaintiff's treating physicians has ever recommended that he not seek employment. (Tr. 14.) The ALJ also pointed out that the record reveals a large gap in any significant treatment between 2006 and 2010. Id. The ALJ noted that, in 2009, Dr. Tate found that Plaintiff could work with restrictions of no prolonged standing or walking, no lifting more than thirty pounds in a squatting position, and no climbing stairs or ladders. (Tr. 14, 208.) The ALJ stated that, as recently as 2010, Dr. Mannis found that Plaintiff was capable of working "primarily in a sedentary capacity." (Tr. 14, 245.) The ALJ acknowledged that Dr. Mannis also found that Plaintiff was unable to function in a capacity involving bending, squatting, lifting, repetitive climbing, or prolonged standing or walking. Id. The ALJ concluded that the RFC he formulated was supported by the treatment notes of Plaintiff's physicians, Plaintiff's own testimony, and the record as a whole. (Tr. 14.)

Plaintiff argues that the ALJ failed to incorporate Dr. Mannis' limitation of no bending. The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. An ALJ is not required to adopt the entirety of a physician's opinion. Instead, the ALJ's determination must be based upon a review of the record as a whole. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011).

The ALJ's RFC determination was primarily based on the medical opinions of Drs. Tate and Mannis. As previously noted, Dr. Tate found that Plaintiff was capable of lifting no more than thirty pounds in a squatting position, no climbing stairs or ladders, and no prolonged standing or walking. (Tr. 208.) The ALJ limited Plaintiff to lifting no more than twenty pounds

occasionally, and standing and walking up to two hours total in an eight-hour workday, and no climbing ropes, ladders, or scaffolds.   The ALJ's determination is consistent with Dr. Mannis' findings regarding Plaintiff's ability to lift, sit, stand, walk, and sit.   (Tr. 246.)   Although the ALJ did not incorporate Dr. Mannis' bending limitation, he did find additional limitations, including a requirement that Plaintiff use a cane for ambulation; a limitation of never kneeling, crouching, crawling, or climbing ropes, ladders, and scaffolds; and environmental limitations.   The ALJ credited Plaintiff's testimony regarding his need for a cane for ambulation by including this limitation even though Dr. Mannis found that Plaintiff did not require a cane.   (Tr. 38-39, 246.) The ALJ did not err in failing to incorporate every limitation found by Drs. Tate and Mannis. Rather, the ALJ properly considered all of the medical opinion evidence, in addition to Plaintiff's testimony regarding his limitations.

Plaintiff also contends that the ALJ erred in failing to acknowledge Dr. Mannis' finding that Plaintiff was unable to sustain a forty-hour workweek.   It is true that Dr. Mannis marked the "no" box for the question regarding whether Plaintiff could sustain a forty-hour workweek on a continuous basis, however, Dr. Mannis also wrote as an explanation to this response "in sedentary capacity."   (Tr. 246.)   Based on the entirety of Dr. Mannis' responses, he qualified his answer by communicating that Plaintiff could sustain a forty-hour workweek on a continuous basis in a sedentary capacity.   Id.   This conclusion is also supported by the fact that Dr. Mannis concluded that Plaintiff was capable of performing the lifting requirements of light work[11] and "able to work primarily in a sedentary capacity."   (Tr. 245.)   Thus, the ALJ did not err in failing to make a

---

[11] Light work requires lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls.   20 C.F.R. 416.967(b).

finding that Plaintiff was unable to sustain a forty-hour workweek, because the record does not support such a finding.

The ALJ's RFC is supported by substantial evidence on the record as a whole. The ALJ found that the objective medical evidence does not support Plaintiff's allegations of disability. Plaintiff received little to no treatment for a significant period of time despite his allegations of disabling pain and limitations since 2003. The ALJ relied on the findings of Drs. Tate and Mannis, as well as Plaintiff's own testimony in determining Plaintiff's RFC. Notably, none of Plaintiff's treating physicians expressed the opinion that he was unable to work. Thus, the ALJ's finding that Plaintiff is capable of performing a limited range of light work is supported by substantial evidence.

## 2.      Vocational Expert

Plaintiff also argues that the hypothetical question posed to the vocational expert did not capture the concrete consequences of Plaintiff's impairments, because it was based on the ALJ's erroneous RFC findings.

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." Hulsey v. Astrue, 622 F.3d 917, 922 (8th Cir. 2010).

The undersigned has found that the ALJ's RFC determination is supported by substantial evidence on the record as a whole. The hypothetical question posed to the vocational expert is consistent with the ALJ's RFC determination. The ALJ concluded, based on this RFC, that Plaintiff was capable of performing other jobs, such as information clerk and call-out operator. (Tr. 15.) Thus, Plaintiff's claim that the hypothetical question was flawed lacks merit.

**Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding Plaintiff not disabled, because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of September, 2014.